# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00259-CV

### In the Matter of J. A.

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT NO. J-24,630, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In 2006 the trial court adjudicated J.A., then 16 years old, guilty of the offense of aggravated robbery and committed him to the Texas Youth Commission for a determinate sentence of sixteen years. Four-and-a-half years later, the youth commission requested that J.A. be transferred to the Institutional Division of the Texas Department of Criminal Justice to complete his sentence. After a hearing, the district court ordered J.A. transferred. In this appeal, J.A. contends that the court abused its discretion by ordering him transferred from the youth commission to the TDCJ. We conclude that the district court acted within its discretionary authority and affirm the transfer order.

We review the district court's decision to transfer J.A. from the youth commission to the TDCJ for an abuse of discretion. *In re D.T.*, 217 S.W.3d 741, 743 (Tex. App.—Dallas 2007, no pet.); *In re C.L.*, 874 S.W.2d 880, 886 (Tex. App.—Austin 1994, no writ). The reviewing court analyzes the district court's decision to determine whether it was made without reference to guiding rules or principles. *In re J.L.C.*, 160 S.W.3d 312, 313 (Tex. App.—Dallas 2005, no pet.). A transfer order will be reversed only if the court acted in an unreasonable and arbitrary manner. *Id.*

When evaluating a request to transfer, the district court may consider: (1) the experiences and character of the person before and after commitment to the youth commission; (2) the nature of the penal offense and the manner in which the offense was committed; (3) the abilities of the person to contribute to society; (4) the protection of the victim of the offense or any member of the victim's family; (5) the recommendations of the youth commission and the prosecuting attorney; (6) the best interests of the person to be transferred; and (7) any other relevant factor. Tex. Fam. Code Ann. § 54.11(k) (West Supp. 2011). The trial court need not consider all of the listed factors and may assign different weights to the factors. *J.L.C.*, 160 S.W.3d at 313-14.

At the transfer hearing, Katherine Hallmark, a psychologist and manager of clinical services at Giddings State School, where J.A. resided, testified that J.A. has done extremely well with his education while at the youth commission. He received his GED and obtained vocational certificates in computers, welding, and building trades. According to Hallmark, J.A. hoped to one day work with his family. Hallmark testified, however, that J.A. has not made progress with regard to his history of gang-related activities. She stated that although J.A. has worked with his caseworker to renounce his gang, he has continued to engage in gang-related behavior, including attempting to contact his co-actor in the offenses resulting in his commitment. Hallmark recounted incidents in which J.A. was believed to have been involved in gang-related assaults on other juveniles at the youth commission.

When he arrived at the youth commission, J.A. was diagnosed with antisocial traits, which included deceit, poor planning, aggressive pattern behavior, disregard for the safety of others, and lack of concern for others' thoughts and feelings. According to Hallmark, J.A.'s history at the

2

youth commission reveals that he is capable of controlling his behavior, as indicated by several months with no incidents, but that in the last six months he has reverted to problem behavior, including possessing contraband, lying, committing assaults, and exhibiting disregard for others. Hallmark testified that J.A. was seen on a videotape snorting and passing around a white powdery substance. When confronted, J.A. denied that he had done this, but upon viewing the videotape acknowledged that it was him. Hallmark stated that this revealed a narcissistic thought process in which a person believes he can do whatever he wants and get away with it.

J.A. did complete the "Alcohol and Other Drugs Program," but his records note a reservation that he has not shown that he feels accountable for his behavior. He also participated in the "Capital Offenders Program" and initially did well discussing his life story and family experiences. He was, however, reluctant to take responsibility for his offense or his pattern of offenses committed while at the youth commission and did not demonstrate accountability for his gang ties or his negative peer associations. J.A. was ultimately removed from the Capital Offenders Program for activity outside the group meeting room that demonstrated his failure to hold himself accountable. Hallmark referred to a psychologist's report that stated that J.A. would admit his involvement in certain activities but would attempt to minimize their severity. Hallmark testified that this indicates that J.A. does not understand how victimization of people can hurt them in many different ways. She testified that based on his negative peer associations, J.A. values "criminal behavior, criminal thinking, doing what you want to do when you want to do it." Hallmark observed that J.A. is a very intelligent and capable person who could have completed the Capital Offenders Program if he had chosen to.

Hallmark expressed concern that J.A. has not renounced his gang affiliation and has stated that he does not plan to separate from his gang-related affiliations until released from the youth commission because it "is important to him to leave the gang in the right way." J.A. shared with her his plan to, upon release, go directly to the leader of the gang in Austin and tell him what he plans to do with his life. Hallmark testified that this indicated to her that J.A. intended to be in contact with gang-affiliated peers, which could be a very high-risk situation. J.A. has expressed no remorse for his crime, which, in Hallmark's view, indicates that he cares about his negative peer associations and his gang members and that he has forgotten about the crimes he committed and how he injured two people.

Hallmark summarized by stating that J.A. is capable of further vocational training and has no mental health issues. J.A. has good support from his family, including his mother and father. He has a history as a violent offender, however, and has continued aggressive behavior at the youth commission, along with continued negative peer associations. While she expressed admiration for J.A.'s educational accomplishments while at the youth commission, she also expressed her concern that J.A., if paroled, would contact his co-actor in his crime and continue gang-related associations.

Shanika Bimage, a case manager at Giddings State School also testified at the transfer hearing. J.A. has been one of her students since approximately October 2009, and she stated that he had always been respectful to her and she has not witnessed him engage in any assaultive behavior. Bimage testified that she was concerned that J.A. continues to have issues with his gang affiliation as evidenced by his doing computer research on gang graffiti. J.A. also had gang graffiti on his math folder. She also stated that J.A. was confident that he would be going home soon and that his actions

at the youth commission were of no consequence.[1] Bimage testified that when she talked to J.A. about his gang activity, he "pushed it under the rug" and acted like it was not a big deal.

According to Bimage, J.A.'s family is very supportive, and he has shared with her his desire to use his vocational skills to open and operate an auto-repair business. J.A. told her that his family had already indicated that they would help him with employment and with obtaining the resources to start a business.

Leonard Cucolo, the court liaison for the youth commission, testified that after the first transfer hearing, he had discussions with J.A. in an effort to assist him with renouncing his gang affiliations. According to Cucolo, although J.A. understood what he needed to do to avoid transfer to the TDCJ, he was unable to "interrupt his thinking pattern" and continued to be involved in and to support a violent gang in the youth commission. He testified that the risk factors for violence remain and that the welfare of the community required transfer. Cucolo acknowledged that J.A. did very well in the Capital Offenders Program with respect to telling his life story, but he also stated that J.A. struggled with maintaining good behavior and severing his ties to the gang. Consequently, Cucolo believed that while J.A. has made improvements, he is still at risk to engage in conduct similar to that which resulted in his commitment, including substance abuse, gang-related involvement, and aggressive or violent offenses. Cucolo's main concern was that J.A. had not internalized necessary changes to his behavior and continued to exhibit evasiveness, difficulty complying with simple rules, and gang-related behavior.

---

[1] The district court had, two years previously, denied a youth commission request to transfer J.A. to the TDCJ. Bimage testified that J.A. was "really positive" about the second transfer hearing and believed that the judge would once again deny the transfer request.

The trial judge spoke at length to J.A. She told him that she remembered him from the previous transfer hearing and that she had asked him to renounce his gang. Although she commended him for doing many of the things she had asked of him, she expressed concern that as one of the oldest residents of the youth commission, whom she had expected to take on a leadership role in talking to others about ending their gang affiliations, he had instead become a "more sophisticated gang-type leader." She observed that allowing him to remain at the youth commission had in some ways done him the injustice of allowing him to be a "big fish in a little pond," and rather than acting as a leader, if he were to be released he would carry that "mentality of being the big fish" with him. She concluded by stating that her decision to transfer J.A. to the TDCJ was based on a desire to protect society and do justice.

**CONCLUSION**

There was extensive testimony at the transfer hearing about J.A.'s performance in the youth commission. The record reveals that J.A. was committed to the youth commission for a determinative sentence of 16 years for the offense of aggravated robbery with a deadly weapon (a stick). Although there was evidence of J.A.'s significant academic achievements, completion of the Alcohol and Other Drugs Program, and near completion of the Capital Offenders Program, as well as a decline in J.A.'s incidents of misconduct during his last year at the youth commission, there was other evidence that his gang-related behavior remained the same and that his behavior was largely volitional. Along with the youth commission's recommendation for transfer, there was evidence that J.A. had not internalized what he had learned in the various programs to effect positive changes in his behavior. The court's statements at the close of the hearing make it plain that she considered the

6

factors in J.A.'s favor as well as those working against him. She expressed both her disappointment that J.A. had wasted an opportunity to use his seniority and mental capabilities to demonstrate positive leadership skills and her concern that, if released, he would pose a risk to the community. Based on this record, we cannot say that the court's decision was made without reference to guiding rules or principles or that the court acted in an arbitrary or unreasonable manner. *See J.L.C.*, 160 S.W.3d at 313. Accordingly, we affirm the district court's order.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Rose and Goodwin

Affirmed

Filed: July 3, 2012